UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | |
| Harris Energy Group, Inc., | Case No. 23-21117-kmp |
| Renewable World Energies, LLC, | Case No. 23-21118-kmp |
| RWE Operations, LLC, | Case No. 23-21120-kmp |
| Flambeau Hydro, LLC, | Case No. 23-21121-kmp |
| Iowa Hydro, LLC, | Case No. 23-21123-kmp |
| Grande Pointe Power Corporation, | Case No. 23-21124-kmp |
| Eau Galle Hydro, LLC, | Case No. 23-21127-kmp |
| UP Hydro, LLC, | Case No. 23-21128-kmp |
| LCO Hydro, LLC | Case No. 23-21129-kmp |
|     Debtors. | |
| | Chapter 11 |
| | (Joint Administration Pending) |

DECLARATION OF WILLIAM D. HARRIS

I, William D. Harris, hereby declare as follows:

1.  I am the chief executive officer of Harris Energy Group, Inc. ("HEG") and a member of its board of directors. I am also the authorized representative of Renewable World Energies, LLC, RWE Operations, LLC, Flambeau Hydro, LLC, Iowa Hydro, LLC, Grande Pointe Power Corporation, Eau Galle Hydro, LLC, UP Hydro, LLC, and LCO Hydro, LLC (collectively, the "Debtors"). As such, I am generally familiar with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records.

2.  I make this declaration in support of the above-captioned debtors' petitions for relief under chapter 11 of the Bankruptcy Code and their first-day motions. Unless otherwise stated, the facts set forth herein are based on my personal knowledge, upon records obtained by the Debtors in the ordinary course of business that I have reviewed, or upon information provided to me by the Debtors' attorneys or employees.

1

3. For the past forty years, I have been extensively involved in the hydroelectric power business. I graduated from the University of Illinois with a degree in electrical engineering. After I graduated, I worked for approximately one year as an engineer for Wisconsin Power and Light (now Alliant Energy Company). As I traveled throughout Wisconsin for Wisconsin Power and Light, I repeatedly came across abandoned hydroelectric projects in rural Wisconsin. With another individual, we soon began purchasing those projects and founded North American Hydro, LLC ("North American Hydro"). Over time, North American Hydro acquired more than forty dams throughout the country. In 2012, approximately half of those dams were sold to an operator in New Jersey. I kept the remaining dams and formed Renewable World Energies, LLC ("RWE").

A. **The Debtor's Corporate Structure**

4. In 2015, I formed HEG as a Wisconsin corporation to serve as the holding company for RWE. In mid-2015, I transferred to HEG my equity interest in RWE. I currently own approximately 95.92% of the outstanding shares of HEG. Thomas A. Berutti owns the remaining 4.08% of shares of HEG. There are currently three members of HEG's board of directors: Jason Kreuscher, Mr. Berutti, and myself.

5. RWE is the sole member of seven subsidiaries: (1) RWE Operations, LLC ("RWEO"), a Wisconsin limited liability company; (2) Flambeau Hydro, LLC, a Wisconsin limited liability company; (3) Marseilles Hydro Power, LLC, a Wisconsin limited liability company; (4) Iowa Hydro, LLC, a Wisconsin limited liability company; (5) Grenfell, LLC, a Michigan limited liability company; (6) UP Hydro, LLC a Wisconsin limited liability company; and (7) Neshkoro Hydro, LLC, a Wisconsin limited liability company. Flambeau Hydro, LLC is the sole equity member of Eau Galle Hydro, LLC, a Wisconsin limited liability company. Iowa

Hydro, LLC is the sole shareholder of Grande Pointe Power Corporation, a Michigan corporation.

6. In addition, HEG wholly-owns LCO Hydro, LLC, a Wisconsin limited liability company.

7. Marseilles Hydro Power, LLC, Grenfell, LLC, and Neshkoro Hydro, LLC are not debtors in these chapter 11 proceedings.

8. A true and correct representation of HEG's organizational structure is attached hereto as **Exhibit A**.

B. **The Debtors' Business**

9. HEG and RWE, through their subsidiaries, own, operate, and develop dams and hydroelectric power facilities in Wisconsin, Michigan, Iowa, and Illinois, generating power for public utilities, governmental agencies, and private power producers. RWE's principal place of business is located at 100 State Street in Neshkoro, Wisconsin.

10. Aside from RWEO (which is an operating entity) and Marseilles Hydro Power, LLC (which currently is not an operating project), the subsidiaries either own or lease hydroelectric power plants which generate power when water from rivers or lakes flows through the blades of a turbine. The turbines are then connected to generators that generate electricity.

11. The electricity generated at the hydroelectric power plants is sold to the Midcontinent Independent System Operator ("MISO"), a non-profit organization regulated by the Federal Energy Regulatory Commission ("FERC") which operates a transmission system and market in fifteen midwestern and southern states, or to other public entities or private companies through power purchase agreements ("PPAs"). PPAs typically contemplate the sale of electricity based on a price per kilowatt hours (kWh).

12. Collectively, HEG and RWE, through their subsidiaries, own seventeen hydroelectric power plants and lease two others. Some of those plants are regulated by FERC.

C. **The Debtors' Workforce**

13. To operate, maintain, and service the hydroelectric power plants and otherwise operate the Debtors' businesses, the Debtors benefit from a talented and dedicated workforce. Under the Debtors' organizational structure, RWEO employs and compensates employees who perform work on behalf of the Debtors. RWEO receives from RWE the funds necessary to compensate employees and pay the cost of benefit programs.

14. Employees who work an average of thirty to forty hours per week are classified as "regular full-time"; employees who work an average of less than thirty hours per week are classified as "regular part-time"; and employees who are hired to work for a specified period of time are classified as "temporary." RWEO currently employs forty individuals in a variety of capacities, of which fourteen are regular full-time, twenty-six are regular part-time, and zero are temporary. Those employees include engineers, plant operators, plant managers, regional service technicians, and administrative personnel.

15. The employees are essential to meet the Debtors' ongoing business needs, such as maintaining and servicing the hydroelectric plants and ensuring that the Debtors are in compliance with applicable regulations. Without the employees, the Debtors would be unable to operate their businesses safely and efficiently and would likely have to stop operating certain plants. The Debtors' ability to reorganize (and preserve their value as going concerns) under chapter 11 of the Bankruptcy Code would be greatly impaired—to the detriment of the Debtors' creditors.

16. As much as the Debtors rely on the talent and skills of the employees, the employees are similarly reliant on the Debtors to support their livelihoods. Based on my interactions with the employees, I believe that the employees cannot (and will not) work without timely compensation.

17. To compensate the employees and ensure their continued employment, RWEO utilizes biweekly payroll cycles, which begin on a Sunday and end on a Saturday. Employees are then paid in arrears the subsequent Friday. Each payroll cycle results in an expense of approximately $50,000.00. All employees are paid via direct deposit or business checks. The most recent pay period ran from February 19, 2023 to March 4, 2023, with employees paid on March 10, 2023. The next scheduled pay date is March 24, 2023 (covering the pay period from March 5, 2023 to March 19, 2023).

18. In the ordinary course of business, RWEO pays for wages, salaries, and reimbursement of approved expenses (including mileage, per diems, and other related expenses). Ten employees are paid based on salary and thirty employees are paid based on hours worked. In addition, RWEO also offers a variety of benefits to its employees working more than 35 hours per week:

(a) Health Insurance: RWEO's health insurance coverage is provided by Aetna. RWEO pays approximately $11,080.81 per month, in advance, in connection with the health insurance benefit. RWEO pays 70% of monthly premiums for fulltime employees, with the remainder collected from participating employees through payroll deductions. Employees can select additional coverage for spouses or children, but the employee pays 100% of the additional expense. As of the Petition Date, RWEO is current on health insurance premiums for the month of March, and the next payment to Aetna will be due at the beginning of April.

(b) Dental Insurance: RWEO's dental insurance coverage is provided by United Healthcare. RWEO pays approximately $1,215.47 per month, in advance, in connection with the dental insurance benefit and vision insurance benefit (discussed below). Although RWEO advances the premium expense, employees pays 100% of monthly premiums through payroll deductions. As of the Petition Date, RWEO is

5

current on dental and vision insurance premiums for the month of March, and the next payment to United Health Care will be due at the end of March.

(c) Vision Insurance: RWEO's vision insurance coverage is provided by United Healthcare. Although RWEO advances the premium expense, employees pays 100% of monthly premiums through payroll deductions. As of the Petition Date, RWEO is current on vision insurance premiums for the month of March.

(d) Simple IRA Plan: RWEO offers employees the opportunity to participate in a simple IRA plan managed through King Financial Group, LLC with American Funds. RWEO matches 100% of each participating employee's contributions up to 1% of the employee's compensation. Including its matching contribution, RWEO pays approximately $1,500.00 per pay period in connection with its retirement plan.

(e) Healthcare Savings Account: RWEO offers employees the opportunity to invest in HSAs through The Stephenson National Bank and Trust ("SNBT"). Employees can direct pre-tax earnings into their HSAs. RWEO currently transfers $836.54 each pay period into employees HSAs.

(f) Life Insurance: RWEO offers employees the opportunity to obtain life insurance policies through United Healthcare. RWEO pays approximately $310.00 per month, in advance in connection with this benefit. Although RWEO advances the premium expense, employees pays 100% of monthly premiums through payroll deductions. As of the Petition Date, RWEO is current on the premiums, and the next payment to United Health Care will be due at the end of March.

(g) Paid Time Off: RWEO offers employees who work at least thirty hours per week paid time off based on years of service and the number of hours worked.

19. During each pay period, in addition to the pre-tax transfers described above, RWEO also withholds certain amounts from employee pay that RWEO is required to transmit to third parties, such as wage garnishments. RWEO currently remits approximately $1,000.00 in garnishments each pay period. In addition, RWEO is required by law to withhold from employee pay amounts related to federal and state income taxes and payroll taxes. RWEO must match payroll taxes from its own funds.

20. Based on my knowledge and review of RWEO's employees and pay status, the Debtors (through RWEO) owe employees and taxing authorities approximately $39,600.00 based on compensation earned in the pay period running up to the Petition Date. This amount

represents an estimated $36,800 in gross earnings plus 2,800.00 in employer-paid taxes. From the gross earnings, RWEO would remit approximately $6,350.00 towards employee-paid taxes, $4,200.00 towards voluntary deductions, and $1,000.00 towards garnishments. These estimates are based on 11/14 of the average time compensated in the payroll cycle which ended February 18, 2023 and was paid on February 24, 2023.

21. If RWEO were unable to compensate employees for their wages or provide the employee benefits explained above, I believe the employees would seek employment elsewhere and that we would be unable to promptly replace those employees. In such circumstances, the Debtors would struggle to operate and the enterprise value of the Debtors would be lost.

**D.**    **Cash Management System**

22. As discussed above, the Debtors collectively operate as a single enterprise. As such, the Debtors maintain a centralized cash management system (the "Cash Management System") which integrates the Debtors' various bank accounts, including those used for collections and the payment of operating expenses, and provides for intercompany transactions between the Debtors.

23. The Cash Management System is managed by the Debtors' bookkeeper. It consists of multiple bank accounts that efficiently collect, transfer, and disburse funds generated by the Debtors' business operations. The Debtors have no investment activity and no investment accounts.

24. The Cash Management System consists of nine bank accounts at the Stephenson National Bank and Trust ("SNBT"), which I believe to be a federally charted, FDIC-insured banking institution with appropriate government guaranteed deposit protection insurance. Those nine accounts are:

| Account Holder | Account Number | Purpose |
|---|---:|---|
| **Renewable World Energies LLC** | **x3261** | **Main Operating Account** |
| Renewable World Energies LLC | x1866 | Flambeau Hydro Maintenance and Tax Reserve Account |
| **RWEO Operations, LLC** | **x3437** | **Payroll Account** |
| RWEO Operations, LLC | x3426 | Business Checking Account |
| Harris Energy Group, Inc. | x7297 | Business Checking Account |
| Grenfell Inc. | x3382 | Business Checking Account |
| Flambeau Hydro LLC | x6945 | Interest Reserve Account |
| Flambeau Hydro LLC | x3305 | Business Checking Account |
| **Iowa Hydro LLC** | **x3349** | **Business Checking Account** |

25. The Debtors use Accounts Nos. x3261 and x3349 (the "Operating Accounts") to collect accounts receivable arising from the sale of energy generated by the Debtors' hydroelectric power plants. Substantially all of the Debtors receipts are directly deposited into the Operating Accounts. The Debtors use Account No. x3437 (the "Payroll Account", and together with the Operating Accounts, the "Essential Accounts") to fund their payroll expense (with funds then transferred directly into the employees' bank accounts).

26. Based on my understanding of the Cash Management System, any immediate disruption to the Debtors' ability to use the Essential Accounts would threaten the Debtors' business operations, their ability to timely receive income from customers, and their ability to meet their payroll expenses. The Essential Accounts allow the Debtors to efficiently collect receipts from customers, promptly pay critical vendors, and coordinate timely disbursements to employees who have elected to receive their compensation through direct deposit.

27. To facilitate payment of ordinary businesses expenses, the Debtors, in the ordinary course of business and as a consolidated enterprise, enter into intercompany transactions with each other through the operation of their Cash Management System (the

8

Case 23-21118-kmp    Doc 11    Filed 03/16/23    Page 8 of 15

"Intercompany Transactions"). The Debtors track the Intercompany Transactions in their accounting system and can ascertain, trace, and account for them as needed.

28. I believe that any distribution to the Debtors' ability to utilize Intercompany Transactions would severely disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders. For example (and as discussed above), RWE collects the Debtors' accounts receivable and then transfers sufficient funds to RWEO so that RWEO can meet payroll obligations (for the benefit of all Debtors).

**E.  Conditions Leading to Filing**

29. The Debtors determined that filing petitions for relief was appropriate based on current cash flow challenges and their ability to reorganize their affairs under chapter 11 of the Bankruptcy Code. As a collective enterprise, I believe that the Debtors have approximately $725,000.00 in general unsecured trade debt. In addition, certain Debtors are indebted or otherwise obligated to secured creditors: Juhl Clean Energy Assets, Inc., SBNT, Berutti Energy, LLC, and Gambit LLC. Without conceding the validity or priority of any claim, I generally understand the Debtors' principal secured debts as follows:

(a) Juhl Clean Energy Assets, Inc. ("Juhl"): On December 17, 2017, Juhl, Flambeau Hydro, LLC ("Flambeau Hydro"), and RWE entered into a Loan Agreement under which Juhl loaned to Flambeau Hydro $7 million to be used for debt retirement, capital improvements, and other general business purposes (the "2017 Loan"). On August 26, 2021, Juhl, Flambeau Hydro, and RWE entered into an Amended and Restated Loan Agreement under which Juhl loaned to Flambeau Hydro an additional $1.8 million to be used for costs associated with a transformer purchase and interconnection upgrade at Flambeau Hydro's Maquoketa hydroelectric power plant, the acquisition of Eau Galle Hydro, LLC ("Eau Galle Hydro"), and for other general business purposes (the "2021 Loan"). On May 23, 2022, Juhl, Flambeau Hydro, and RWE entered into a Second Amended and Restated Loan Agreement under which Juhl loaned to Flambeau Hydro an additional $6.5 million (which also retired the 2021 Note) (the "2022 Loan"). Juhl appears to hold a general business security interest in Flambeau Hydro's assets, a mortgage and assignment of rents on several parcels of real estate in Price, Sawyer, Burnett, and Polk County, and a security interest in several PPAs, agreements, leases, and FERC licenses. In addition, it

9

appears that RWE executed a guaranty and a pledge agreement granting Juhl a security interest in RWE's interest in Flambeau Hydro; that Eau Galle executed a guaranty, a pledge and security agreement granting Juhl a general business security interest in all personal property, a collateral assignment of contracts, licenses, and permits, and a leasehold mortgage on property in Eau Galle, Wisconsin; and that Iowa Hydro executed a guaranty, a security and pledge agreement under which it granted Juhl a security interest in its equity in Grande Pointe and a general business security agreement in all personal property, a mortgage (including assignment of rents and leases) in property in Three Rivers, Michigan, and a collateral assignment of contracts, licenses, and permits in a PPA. In addition, it appears that Juhl extended to RWE a $250,000.00 line of credit. Accordingly, based on the Debtors' books and records, it appears that the outstanding balance owing to Juhl is approximately $13.75 million.

(b) SNBT: In 2015, RWE and SNBT executed a Revolving Credit and Term Loan Agreement under which SNBT loaned to RWE $3.3 million (the "2015 Loan"). UP Hydro, LLC ("UP Hydro") guaranteed RWE's obligations under the 2015 Loan and delivered to SNBT a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Financing Statement against approximately 2,500 acres of real estate in Autrain, Michigan. On December 21, 2017, it appears that the parties refinanced the 2015 Loan and RWE executed a promissory note payable to SNBT in the principal amount of $6.61 million. Based on the Debtors' books and records, it appears that the outstanding balance owing to SNBT is approximately $1.956 million.

(c) Berutti Energy, LLC ("Berutti Energy"): On September 20, 2022, Sugarloaf Hydro, LLC, an entity in which Mr. Berutti and I each own 50%, executed a promissory note payable to Berutti Energy in the principal amount of $550,000.00. It appears that HEG and LCO Hydro, LLC executed guaranties in favor of Berutti Energy and that HEG granted Berutti Energy a security interest in HEG's membership interest in LCO Hydro, LLC. On December 29, 2022, it appears that Sugarloaf Hydro, LLC executed an amended promissory note to replace the September 20, 2022 note and increased to $625,000.00 the principal balance payable with a maturity date of March 19, 2023.

(d) Gambit LLC: On March 10, 2023, the Debtors (and three non-filing entities) executed a promissory note payable to Gambit LLC in the principal amount of $250,000.00 for the purpose of paying retainers to the Debtors' proposed professionals. A non-debtor, Marseilles Hydro Power, LLC, also executed a mortgage in favor of Gambit LLC.

30. Over the course of the past several years, I have also loaned over $2 million to the Debtors so that they could meet operating expenses.

31. Based on my understanding of the various debt facilities described above, the respective Debtors had a monthly payment to SBNT due on March 15, 2023 and have the principal and maturity of the loan to Berutti Energy due on March 19, 2023 and a quarterly

interest payment to Juhl on March 31, 2023. The Debtors timely made the payment to SBNT, but will be unable to meet their remaining debt obligations and therefore determined that protections under the Bankruptcy Code would provide necessary relief and the opportunity to reorganize.

32. In addition to the challenges relating to cash flow, Juhl, RWE, Iowa Hydro, and RWEO had been negotiating the sale of (1) Flambeau Hydro and its interest in Eau Galle Hydro, (2) LCO Hydro, LLC, (3) Grande Pointe Power Corporation, and (4) Grenfell, LLC. In short, the proposed transaction contemplated consideration of $16.9 million to satisfy the 2017 and 2022 Loan with the remaining balance in cash, RWE receiving a $500,000.00 common equity ownership in Main Street Hydro, LLC ("Main Street Hydro", the entity through which Juhl contemplated the acquisition), pro rata proceeds from an anticipated loan to Main Street Hydro, and a $1.5 million loan to Iowa Hydro.

33. Those negotiations principally went through Mr. Berutti, HEG's former chief executive officer. It became clear that Mr. Berutti was using the sale process to leverage a substantial severance package from HEG that would consume principally all of the cash portion of the deal. Given these circumstances, a majority of HEG's board of directors determined that (1) it was appropriate to terminate Mr. Berutti's employment with cause and (2) seeking relief under the Bankruptcy Code would better allow HEG to manage the sale process (if it were to determine that a sale would be in the best interests of their estates).

34. Nothing contained in this declaration is intended to in any way comment on or concede the validity, enforceability or priority of any particular claim, but rather is a summary of the Debtors' books and records as they are kept in the ordinary course of business.

F.  **Cash Collateral Motion**

35. I understand that the Debtors collectively hold approximately $130,000.00 in cash on hand as of the Petition Date, and have receivables of approximately $85,000.00. Based on the foregoing debt facilities, I believe that the cash on hand and accounts receivable are encumbered by liens either arising from the loan and collateral documents (which may be unperfected) or the mortgages and assignment of rents and income.

36. The Debtors use cash on hand, and cash flow from operations, to meet their working capital needs, including payment to and for the benefit of employees, trade vendors, and insurers. Without access to the cash and other revenues generated by the Debtors' business operations, I believe that the Debtors' ability to continue operating on an uninterrupted basis and utilize these chapter 11 cases to pursue an orderly restricting transaction would be jeopardized.

37. I understand the Debtors have filed a motion seeking permission to use cash collateral and grant adequate protection to secured creditors. Based on my understanding of the Debtors' loan facilities and the contemplated collateral, I believe that Juhl, SNBT, and Berutti Energy have a substantial equity cushion:

(a) Juhl: As described above, Juhl has proposed to purchase (1) Flambeau Hydro and its interest in Eau Galle Hydro, (2) LCO Hydro, LLC, (3) Grande Pointe Power Corporation, and (4) Grenfell, LLC for $16.9 million (plus an equity position in the successor entity, pro rata proceeds from a loan, and a loan to Iowa Hydro). Aside from Iowa Hydro, the sale contemplates Juhl's purchase of nearly all of its collateral. In place of Iowa Hydro, Juhl has proposed to purchase LCO Hydro, LLC and Grenfell, LLC, which I believe to be of generally equal value to Iowa Hydro. Based on the cash purchase price, I believe that Juhl has an equity cushion of *at least* $3.15 million.

(b) SBNT: RWE's and UP Hydro's obligations to SBNT appear to be secured by virtually all of UP Hydro's real estate, which I believe to be worth approximately $3.82 million. As such, I believe that SBNT has an equity cushion of approximately $1.86 million.

(c) Berutti Energy: HEG's and obligation to Berutti Energy appear to be secured by HEG's interest in LCO Hydro, LLC. Based on the books and records, I believe that

LCO Hydro has cash flow of approximately $200,000.00. Based on a 10x multiple of that cash flow, I believe LCO Hydro to be worth approximately $2 million. As such, I believe that Berutti Energy has an equity cushion of approximately $1.37 million.

G. **Prospects for Reorganization**

38. Although the Debtors are currently facing financial difficulties, I believe there is a strong possibility that the Debtors will successfully emerge from these chapter 11 proceedings. Over the past several weeks, I have worked with the Debtors' counsel and financial advisor to review the Debtors' business operations and to develop a strategy to address those challenges. In addition, I have met with representations of Juhl and SNT to outline the situation and the potential resolution of the Debtors' financial difficulties.

39. That strategy has four goals: (a) eliminating unnecessary and expensive employee compensation and other business expenses; (b) restructuring the Debtors' secured debts; (c) completing capital improvements to certain hydroelectric plants in order to generate additional revenue; (d) partnering with and selling electricity to Bitcoin miners. The Debtors may also decide to proceed with the contemplated sale to Juhl of all or a portion of the Debtors' businesses on terms that are acceptable to all parties.

40. If the Debtors are able to achieve those goals, I believe the Debtors will have sufficient cash flow to service their debts, operate their businesses, and confirm a chapter 11 plan of reorganization.

[signature page follows]

## Declaration

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 16, 2023.

_____
William D. Harris

# EXHIBIT A

